# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK FOSTER, MARY SCHEINER, ARTHUR GIORDANO, SHANNON BROOKS, ERIC ELDRIDGE, KEVIN REED, LAMPTON WILLIS, and GEORGE MILLER, on behalf of themselves and all others similarly situated, | Case No. 2:21-cv-1820 |
| | **CLASS ACTION COMPLAINT** |
| *Plaintiffs*, | |
| V. | |
| KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS RS NORTH AMERICA LLC, | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiffs Mark Foster, Mary Scheiner, Arthur Giordano, Shannon Brooks, Eric Eldridge, Kevin Reed, Lampton Willis, and George Miller ("Plaintiffs"), on behalf of themselves and the class and subclasses defined below, for their complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively "Philips" or the "Defendants"), allege the following based on (a) personal knowledge as to themselves, (b) the investigation of counsel, and (c) information and belief.

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs bring this action on behalf of themselves and a proposed class and subclasses of purchasers, lessees, and users of Continuous Positive Airway Pressure (CPAP), Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and Mechanical Ventilators Devices manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.      On April 26, 2021, Philips made a public announcement disclosing that it had determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and Mechanical Ventilator Devices it manufactured may degrade or off-gas under certain circumstances.

3.      On June 14, 2021, Royal Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and Mechanical Ventilator Devices containing PE-PUR Foam (collectively "Recalled Device" or Recalled Devices") because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that could enter the devices' pathway and be ingested or inhaled by users and (b) the PE-PUR Foam may off-gas certain chemicals during operation.[1] Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[2]

4.      Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[3]

5.      Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure, and sinus infection from users of these devices.

---

[1] *See* Philips Recall Notice attached hereto as Exhibit "A."

[2] *Id.*

[3] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed December 8, 2021).

6.　　　In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver), and toxic carcinogenic effects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

7.　　　In its Recall Notice Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.　　　In November 2021, Philips adjusted its recommendation for CPAP and Bi-Level PAP users to: "consult with [their] physician on a suitable treatment plan."[4]

9.　　　Plaintiffs each purchased a Recalled Device, which Plaintiffs each used regularly at night through the Phillips Recall Notice.

10.　　　No one would have purchased, leased or used these products had the Defendants disclosed the health risks before each sale.

11.　　　The failure to disclose the known risks also constituted an unfair business practice in that it was unfair and fraudulent to consumers and uniformly impacted and damaged Plaintiff and all Class and Subclass members who would not have otherwise purchased, leased or used the Recalled Devices.

---

[4] Philips Updated Recall Notification, https://www.usa.philips.com/healthcare/e/sleep/communications/src-update (accessed December 10, 2021).

12.     Similarly, the universal warranty promise from Defendants that the Recalled Devices would be "free from defects of workmanship and materials" was false, misleading and unlawful in that Defendants breached the warranties, express and implied, by so warrantying these products.

13.     Consumers who use the Recalled Devices have complained about black particles in their machines for several years. Philips, however, did not warn the public or its customers about these hazards until late April 2021, and did not issue a recall of the Recalled Devices until June 14, 2021.

14.     Philips has no concrete timeline for replacing or repairing any of the Recalled Devices.

15.     The recall of the Recalled Devices coincided with the launch of Defendants' next generation of products, which purportedly do not suffer from the same PE-PUR Foam issues. An option that Philips offers to its customers—many of whom need and rely on the Recalled Devices—is to purchase or lease a newer model, thus further profiting from its own wrongdoing.

16.     But the replacement devices themselves, as reported on November 18, 2021, present the risk of harm to users due to the use of the same silicone based foam that emits harmful gases.

17.     Beyond this, it was reported on December 2, 2021, that Philips Respironics knew of the health risks associated with the recalled devices for years but did not take immediate remedial action.

18.     Plaintiffs and all others who are similarly situated have been forced into a "Hobson's Choice" situation by the Defendants: wait an indefinite period of time for a replacement device that itself is not proven safe and effective and presents health risks to users,

4

expend significant funds replacing their Recalled Devices with a wholly different device to the extent they can do so, or forego using a sleep device at their own peril.

19.      Plaintiffs seek to recover damages based on, *inter alia*, Philips' breach of express warranty, breach of implied warranties, misrepresentations, omissions, and breaches of state consumer protection laws in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of themselves and the proposed Class and Subclasses. In addition, Plaintiffs seek medical monitoring damages for users of Philips' devices identified in the Recall Notice, who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver), and toxic carcinogenic effects.

## PARTIES

### A.      Plaintiffs

20.      Plaintiff Mark Foster ("Foster") is citizen of the State of Alabama.

21.      Plaintiff Mary Scheiner ("Scheiner") is a citizen of the State of California.

22.      Plaintiff Arthur Giordano ("Giordano") is a citizen of the State of Florida.

23.      Plaintiff Shannon Brooks ("Brooks") is a citizen of the State of Illinois.

24.      Plaintiff Eric Eldridge ("Eldridge") is a citizen of the State of Iowa.

25.      Plaintiff Kevin Reed ("Reed") is a citizen of the State of Louisiana.

26.      Plaintiff Lampton Willis ("Willis") is a citizen of the State of Mississippi.

27.      Plaintiff George Miller ("Miller") is a citizen of the State of New York.

### B.      Defendants

28.      Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the

Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS.[5] Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.[6]

29.     Defendant Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

30.     Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[7]

## JURISDICTION AND VENUE

31.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class and Subclass who are diverse from Defendants, and (4) there are more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28

---

[5] Philips 2020 annual filing with the SEC, fn. 8, https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed December 8, 2021).

[6] Philips 2020 annual filing with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (accessed December 8, 2021).

[7] Philips announces completion of tender offer to acquire Respironics, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed December 8, 2021).

U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

32.    Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and because the Defendants caused harm to class members residing in this District.

33.    The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiffs' claims arise out of and relate to Defendants' contacts with this District. Moreover, Defendant Philips RS has its principal place of business in the forum State. Defendants Philips RS and Philips NA are controlled by their parent Royal Philips. Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in the forum State. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## FACTUAL BACKGROUND

### A.    Continuous Positive Airway Pressure Therapy

34.    Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose

and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

35.    Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### B.    Bi-Level Positive Airway Pressure Therapy

36.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably

breathe out. Bi-Level PAP devices deliver one level of pressurize air (the inspiratory positive

level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

      **C.**    **Mechanical Ventilation**

    37.    Mechanical ventilation is a treatment to help a person breathe when they find it

difficult or are unable to breathe on their own. A Mechanical Ventilator Device pushes airflow

into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation

with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital

or a long-term institutional setting. Non-invasive ventilation can be used at home by people with

respiratory difficulties.

**SUBSTANTIVE ALLEGATIONS**

    38.    Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP

respirator devices and Mechanical Ventilator Device under its "Sleep & Respiratory Care"

segment of its business designed to assist individuals with a number of sleep, breathing, and

respiratory conditions, including obstructive sleep apnea, central sleep apnea, complex sleep

apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those

individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital

environments. Philips' CPAP and Bi-Level PAP respirator devices and its Mechanical Ventilator

Devices typically cost several hundred, if not thousands of dollars. Philips has sold millions of

these devices in the United States.

      **A.**    **Philips Sleep & Respiratory Care Devices Endangered Users**

    39.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the

first time, under a section entitled "Regulatory Update," that device user reports had led to a

discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi-

Level PAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[8]

40.    Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its Mechanical Ventilator Devices "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[9] Specifically, Philip announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[10] In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[11]

---

[8] First Quarter Results, PHILIPS (Apr. 26, 2021), https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed December 8, 2021).

[9] *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (accessed December 8, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed December 8, 2021).

[10] *Id.*

[11] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed December 8, 2021).

41.     The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[12] | |
|---|---|
| **Device Name/Model Type** | **Type** |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[13] | |
|---|---|
| **Device Name/Model Type** | **Type** |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |

---

[12] Recall Notice (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS. https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed December 8, 2021); Royal Philips Update on the recall notification, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed December 8, 2021).

[13] *Id.*

42.     According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."[14]

43.     Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[15]

44.     Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."[16]

45.     Philips announced that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[17]

B.     **The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless**

46.     As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to Defendants or discovered by Defendants, and through the present, the Recalled Devices have

---

[14] *Id.*

[15] Philips *Sleep and Respiratory Care Update – Clinical information for physicians*, June 14, 2021, philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed December 8, 2021).

[16] *Id.*

[17] Recall Notice (Exhibit "A" hereto).

been rendered completely worthless or, at the very least, have been substantially diminished in value.

47.    The information described above, including the now-known health risks of Philips CPAP devices, Bi-Level PAP devices and Mechanical Ventilator Devices, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions. Individuals not using life-supporting ventilators must immediately discontinue their user of the Recalled Devices or face serious health risks as grave as organ failure or cancer. If they choose to discontinue use of the Recalled Devices, they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions. Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

48.    Recognizing this, in its Recall Notice Philips issued the following advice to patients using any of the Recalled Devices:

- "**For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[18]

- "**For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps.**"[19]

49.    Philips later advised users of the recalled CPAP and Bi-Level PAP devices to consult with their physicians on a suitable treatment plan.

50.    As a result of the above, Plaintiffs and the Class and Subclasses will have to undertake considerable expense replacing the Recalled Devices.

---

[18] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021) (Questions and answers) (emphasis in original).

[19] *Id.*

51.     But recalling the Recalled Devices is not the panacea.  On November 18, 2021, The Wall Street Journal Online, in an article entitled "Sleep Apnea Device Recall From Philips Causes New Worry; After Summer Recall, FDA says replacement devices being shipped to users could be harmful too," reported in pertinent part, as follows:

> Last week, users were thrown another curveball when the Food and Drug Administration warned the replacement machines that the Dutch health giant has been cranking out since September may be harmful, too.  The FDA didn't order a recall of some 250,000 replacement devices Philips has sent to users, but said it was concerned that a silicone-based foam used in the substitute devices could emit harmful gases.  That has raised new questions among users about what to do.
>
> &#42;&#42;&#42;
>
> The FDA's latest concerns, which it made public Friday, surfaced during a recent inspection of the Murrysville, Pa., facility where Philips makes its CPAP and BiPAP machines.  Inspectors discovered that a similar device sold outside the U.S., which also used silicone-based foam, failed a safety test because it released potentially harmful gases.
>
> &#42;&#42;&#42;
>
> The FDA report detailed findings suggesting that the company had for years taken inadequate action in response to complaints relating to foam degradation.

C.     **Philips Unreasonably Delayed its Recall**

52.     At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

53.     Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[20]

---

[20] Recall Notice (Exhibit "A" hereto).

54.     At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.  Philips Respironics became aware of the foam degradation issue in at least 2015, or earlier.

55.     On December 2, 2021, an article published by NBC 5 Responds, entitled "FDA Finds Maker of Recalled Sleep Aid Devices Knew of Problems For Years, But Didn't Act" reported, in pertinent part, as follows:

> A Food and Drug Administration (FDA) investigation alleges that for years, the Philips Respironics company knew of health risks associated with its sleep aid devices but did not immediately act.
>
> ***
>
> While the recall was startling surprise for users of these devices, the problems at the heart of the matter were not a surprise to the company, as it may have known of the issues for quite some time, according to an investigation by the Food and Drug Administration (FDA).
>
> The voluntary Class 1 recall of the devices triggered several FDA inspections of Philips Respironics' manufacturing facility in Pennsylvania this past August and November.
>
> Among many things, the FDA inspectors looked through the company's digital records, facility operations and product testing, all in an effort to determine what may  have caused or contributed to the foam issues that led the recall and assess whether the company had met federal manufacturing requirements.
>
> In example after example, investigators allege for years, staff within the Philips Respironics company knew of foam degradation problems in its devices but did not immediately act.  In addition, the investigation found executive managers for the company knew of the problems for more than a year before issuing the voluntary recall.
>
> According to the FDA's inspection, there were warnings from inside the company.  This included "at least 14 tests or assessments" from as early as 2016 where Philips' staff were "aware of issues and concerns related to potential foam degradation."

There were internal emails that FDA inspectors cite including one in 2015 from an employee of Philips to the company's raw foam supplier that "implies that a customer made [Phillips] aware of polyester polyurethane foam degradation issues," the report said.

After the company had received complaints of foam degradation in its products, in 2018, inspectors found a conversation over email with Philips' staff acknowledging the company's own internal tests had confirmed the foam could fall apart when exposed to high humidity or heat.

But, the FDA inspection found, in that same conversation, Philips' personnel said the company had "made the decision to not change the design" and continue to include the foam in its ventilator devices.

And from outside of the company's walls, inspectors found there were external warnings, including tens of thousands of consumer complaints that the FDA said did not trigger any immediate action.

An analysis of consumer complaints sent to the company revealed that since 2008, Philips Respironics had received "over 222,000 complaints" that included the keywords "contaminants, particles, foam, debris, airway, particulate, airpath and black."

Of those, at least 110 complaints from 2014 to 2017 were directly related to the foam degradation problems at the heart of the voluntary recall.

The FDA's inspection found Philips' Executive Management were made aware of potential foam degradation from "as early as January of 2020, or earlier, but implemented no corrective actions until April 2021."

FDA inspectors said, "Additionally, [Philips Respironics] became aware of this [foam degradation] issue and related field complaints in at least 2015 or earlier."

***

After the initial recall, regulators said Philips Respironics planned to repair the CPAP and BiPAP devices' polyester-based polyurethane foam – the foam that degrades and can cause injury – with a different, silicone-based foam.

Now, months later, the FDA warns that the new silicone-based foam failed a safety test, and could be hazardous.

"During the manufacturing facility inspection, the FDA obtained additional information, not previously available to the agency, regarding the silicone-based foam used in a singular, similar device marketed outside the U.S., which failed one safety test for the

16

release of certain chemicals of concern," a news release that accompanied the FDA inspection's findings reads.

*** 

Inspectors found "no documented investigation, risk analysis or design analysis to support Philips' rationale for which polyester polyurethane foam-containing products were included or not included in the ongoing recall."

###    D.    Plaintiffs

**Alabama Plaintiff**

56.    Plaintiff Foster is a citizen and resident of the State of Alabama.

57.    Plaintiff Foster owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

58.    Plaintiff Foster overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risk associated with its use.

59.    As a result of the health risk associated with the use of the Recalled Device, Plaintiff Foster's Recalled Device is worthless.

**California Plaintiff**

60.    Plaintiff Scheiner is a citizen and resident of the State of California.

61.    Plaintiff Scheiner owned or leased and regularly used, Recalled Device to treat a medical condition until learning of the Philips Recall.

62.    Plaintiff Scheiner overpaid for a Recalled Device when it was purchased or leased without knowledge of the health risk associated with the use of such Recalled Devices.

63.    As a result of the health risk associated with the use of Recalled Devices, Plaintiff Scheiner's Recalled Device is worthless.

**Florida Plaintiff**

64.     Plaintiff Giordano is a citizen and resident of the State of Florida.

65.     Plaintiff Giordano owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

66.     Plaintiff Giordano overpaid for a Recalled Device when it was purchased or leased without knowledge of the health risk associated with the use of Recalled Devices.

67.     As a result of the health risk associated with the use of Recalled Devices, Plaintiff Giordano's Recalled Device is worthless.

**Illinois Plaintiff**

68.     Plaintiff Shannon Brooks is a citizen and resident of the State of Illinois.

69.     Plaintiff Brooks owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

70.     Plaintiff Brooks overpaid for a Recall Device when it was purchased or leased without notice or knowledge of the health risk associated with the use of Recalled Devices.

71.     As a result of the health risk associated with the use of Recalled Devices, Plaintiff Brooks' Recalled Device is worthless.

**Iowa Plaintiff**

72.     Plaintiff Eric Eldridge is a citizen and resident of the State of Iowa.

73.     Plaintiff Eldridge owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

74.     Plaintiff Eldridge overpaid for a Recall Device when it was purchased or leased without notice or knowledge of the health risk associated with the use of Recalled Devices.

75.     As a result of the health risk associated with the use of Recalled Devices, Plaintiff Eldridge's Recalled Device is worthless.

**Louisiana Plaintiff**

76.     Plaintiff Reed is a citizen and resident of the State of Louisiana.

77.     Plaintiff Reed owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

78.     Plaintiff Reed overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risk associated with the use of Recalled Devices.

79.     As a result of the health risk associated with the use of Recalled Devices, Plaintiff Reed's Recalled Devices is worthless.

**Mississippi Plaintiff**

80.     Plaintiff Willis is a citizen and resident of the State of Mississippi.

81.     Plaintiff Willis owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

82.     Plaintiff Willis overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risk associated with the use of Recalled Devices.

83.     As a result of the health risk associated with the use of Recalled Devices, Plaintiff Willis' Recalled Device is worthless.

**New York Plaintiff**

84.     Plaintiff Miller is a citizen and resident of the State of New York.

85.     Plaintiff Miller owned or leased and regularly used a Recalled Device to treat a medical condition until learning of the Philips Recall.

86.     Plaintiff Miller overpaid for a Recalled Device when it was purchased or leased without notice or knowledge of the health risk associated with the use of Recalled Devices.

87.     As a result of the health risk associated with the use of Recalled Devices, Plaintiff Miller's Recalled Device is worthless.

## TOLLING AND ESTOPPEL

### A.     DISCOVERY RULE TOLLING

88.     Plaintiffs and the Nationwide Class and State Subclasses had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

89.     Neither Plaintiffs nor any other members of the Nationwide Class and State Subclasses, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiffs and members of the Nationwide Class and State Subclasses did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

90.     For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs, the Nationwide Class and State Subclasses.

### B.     FRAUDULENT CONCEALMENT TOLLING

91.     By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Nationwide Class and State Subclasses.

92.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiffs and members of the Nationwide Class and State Subclasses. Plaintiffs and the members of the Class and Subclass were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Nationwide Class and State Subclasses should be tolled.

## CLASS ACTION ALLEGATIONS

93.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Plaintiffs seek class certification on behalf of a class defined as follows (the "Class"):

> **NATIONWIDE CLASS**: All persons in the United States who purchased, leased, or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

94.     Plaintiffs seek certification on behalf of subclasses defined as more fully set forth below and collectively referred to as the "State Subclasses."

95.     Plaintiff Foster seeks certification on behalf of a subclass defined as follows ("Alabama Subclass"):

> **ALABAMA SUBCLASS:**  All persons who were or are citizens of the State of Alabama who purchased, leased, or used a CPAP, Bi-Level PAP, or Mechanical Ventilator Device that was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

96.     Plaintiff Scheiner seeks certification on behalf of a subclass defined as follows ("California Subclass"):

> **CALIFORNIA SUBCLASS:**  All persons who were or are citizens of the State of California who purchased, leased, or used a CPAP, Bi-Level PAP, or Mechanical Ventilator Device that was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

21

97.     Plaintiff Giordano seeks certification on behalf of a subclass defined as follows

("Florida Subclass");

>   **FLORIDA SUBCLASS:**  All persons who were or are citizens of the State of Florida who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

98.     Plaintiff Brooks seeks certification on behalf of a subclass defined as follows

("Illinois Subclass");

>   **ILLINOIS SUBCLASS:** All persons who were or are citizens of the State of Illinois who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

99.     Plaintiff Eldridge seeks certification on behalf of a subclass defined as follows

("Iowa Subclass");

>   **IOWA SUBCLASS:** All persons who were or are citizens of the State of Indiana who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

100.    Plaintiff Reed seeks certification on behalf of a subclass defined as follows

("Louisiana Subclass")

>   **LOUISIANA SUBCLASS:** All persons who were or are citizens of the State of Louisiana who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

101.    Plaintiff Miller seeks certification on behalf of a subclass defined as follows

("New York Subclass");

>   **NEW YORK SUBCLASS:** All persons who were or are citizens of the State of New York who purchased, leased, or used CPAP, Bi-Level PAP, or Mechanical Ventilator Device was manufactured by Philips before April 26, 2021 and recalled by Philips on June 14, 2021.

102.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclass based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

103.    Excluded from the Nationwide Class and State Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Nationwide Class and State Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

104.    **Numerosity (Rule 23(a)(1))**. The Nationwide Class and State Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Nationwide Class and State Subclasses, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

105.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Nationwide Class and State Subclasses members, including the following:

- whether Defendants owed a duty of care to Plaintiffs and the Nationwide Class and State Subclasses;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

- whether Defendants breached their implied warranties;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

- whether Plaintiffs and the members of the Nationwide Class and State Subclasses are entitled to actual, statutory, and punitive damages.

106.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Nationwide Class and State Subclasses. Plaintiffs and members of the Nationwide Class and State Subclasses (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Nationwide Class and State Subclasses.

107.    **Adequacy (Rule 23(a)(4))**. Plaintiffs' interests are aligned with the Nationwide Class and State Subclasses he seeks to represent. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Nationwide Class and State Subclasses. Plaintiffs have retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Nationwide Class and State Subclasses. Plaintiffs have no interest that is antagonistic to those of the Class and Subclass, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Nationwide Class and State Subclasses.

108.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Nationwide Class and State Subclasses is impracticable. The prosecution of separate actions by individual members of the Nationwide

Class and State Subclasses would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Nationwide Class and State Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

109.    **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

110.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### BREACH OF EXPRESS WARRANTY
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

111.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

112.    Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiffs and the Nationwide Class and State Subclasses.

113.    Philips expressly warranted, advertised, and represented to Plaintiffs and the Nationwide Class and State Subclasses that the Recalled Devices were safe and appropriate for human use.

114.     Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiffs and the Nationwide Class and State Subclasses entered into upon purchasing the Recalled Devices.

115.     Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiffs and the Nationwide Class and State Subclasses. Plaintiffs and the Nationwide Class and State Subclasses relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

116.     Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

117.     Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

118.     Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiffs and

members of the Nationwide Class and State Subclasses that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

119.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

120.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiffs and members of the Nationwide Class and State Subclasses. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiffs and members of the Nationwide Class and State Subclasses at the time of purchase of the Recalled Devices.

121.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

122.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiffs and members of the Nationwide Class and State Subclasses to rely on such representations and omissions.

123.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiffs and members of the Nationwide Class and State Subclasses reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

124.    All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiffs or members of the Nationwide Class and State Subclasses.

125.    Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiffs and members of the Nationwide Class and State Subclasses, but failed to do so until now.

126.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiffs and members of the Nationwide Class and State Subclasses have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiffs and members of the Nationwide Class and State Subclasses did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

127.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (on behalf of the Nationwide Class or, alternatively, the State Subclasses)

128.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

129.    Philips are merchants engaging in the sale of goods to Plaintiffs and the Nationwide Class and State Subclasses.

130.    There was a sale of goods from Philips to Plaintiffs and the Nationwide Class and State Subclasses.

131.    At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiffs and the Nationwide Class and State Subclasses, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use. Plaintiffs and the Nationwide Class and State Subclasses relied on Philips' promises and affirmations of fact and omissions when they purchased and used the Recalled Devices.

132.    Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use and did not conform to Philips' affirmations of fact and promises and omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

133.    Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

134.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

135.    Privity exists because Philips impliedly warranted to Plaintiffs and the Nationwide Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of the attendant health risks associated with use of the Recalled Devices.

136.     As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

137.     Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

### THIRD CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

138.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139.     Philips failed to advise Plaintiffs and the Nationwide Class and State Subclasses that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiffs and the Nationwide Class and State Subclasses that the Recalled Devices were safe for human use.

140.     Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiffs and the Nationwide Class and State Subclasses to purchase the Recalled Devices.

141.     Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Nationwide Class and State Subclasses.

142.    Plaintiffs and the Nationwide Class and State Subclasses did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiffs' and the Nationwide Class' and State Subclasses' reliance on Philips' omissions and misrepresentations was justifiable.

143.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

144.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FOURTH CLAIM FOR RELIEF

### FRAUD BY OMISSION
### (on behalf of Nationwide Class or, alternatively, the State Subclasses)

145.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

146.    Philips concealed from and failed to disclose to Plaintiffs and the Nationwide Class and State Subclasses that use of Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

147.    Philips was under a duty to disclose to Plaintiffs and the Nationwide Class and State Subclasses the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its

products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiffs and the Nationwide Class and State Subclasses could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

148.    The facts concealed or not disclosed by Philips to Plaintiffs and the Nationwide Class and State Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

149.    Plaintiffs and the Nationwide Class and State Subclasses justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

150.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

151.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

152.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

153.    Philips had a duty to Plaintiffs and the Nationwide Class and State Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

154.    Philips breached its duty to Plaintiffs and the Nationwide Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

155.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that: (a) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Recalled Devices were otherwise not as warranted and represented by Philips.

156.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Nationwide Class and State Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the

Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

157.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**(on behalf of the Nationwide Class or, alternatively, the State Subclasses)**

158.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

159.    Plaintiffs and the Nationwide Class and State Subclasses conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

160.    Philips either knew or should have known that the payments rendered by Plaintiffs and the Nationwide Class and State Subclasses were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

161.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiffs and the Nationwide Class and State Subclasses.

162.    Plaintiffs and the Nationwide Class and State Subclasses are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

163.    Plaintiffs and the Nationwide Class and State Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## SEVENTH CLAIM FOR RELIEF

**PENNSYLVANIA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW,
73 Pa. Cons. Stat. Ann. §§ 201-1, et seq.
(on behalf of the Nationwide Class)**

164.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

165.     At all times mentioned herein, Philips engaged in "trade" or "commerce" in Pennsylvania, as defined by 73 Pa. Cons. Stat. Ann. § 201-2(3), in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold "services," "property," "article[s]," "commodity[ies]," or "thing[s] of value" in Pennsylvania.

166.     Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTCPL"), 73 Pa. Cons. Stat. Ann. § 201-3 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…are hereby declared unlawful."

167.     For the reasons discussed herein, Philips violated and continues to violate the UTCPL by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by UTCPL §§ 201-1, *et seq.* Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

168.     Philips repeatedly advertised on the labels and packing for the Recalled Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Recalled Devices were safe and fit for human use. Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

36

169.     Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the Recalled Devices without being aware that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiffs and the Nationwide Class and Pennsylvania Subclass members suffered damages by purchasing the Recalled Devices because they would not have purchased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains unsafe PE-PUR Foam which can cause a number of adverse health effects, including organ failure and cancer.

170.     Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiffs and members of the Nationwide Class in the form of the loss or diminishment of value of the Recalled Devices that Plaintiffs Nationwide purchased, which allowed Defendants to profit at the expense of Plaintiffs, Nationwide Class members, and State Subclass members. The injuries Plaintiffs sustained were to legally protected interests. The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

171.     Plaintiffs and Class Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by 73 Pa. Cons. Stat. Ann. § 201-9.2 and applicable law.

## EIGHTH CLAIM FOR RELIEF

### MEDICAL MONITORING
**(on behalf of the State Subclasses, except for Class Members
who purchased or leased a Recalled Device for business use only)**

172.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

173.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiffs.

174.    Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

175.    When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver), and toxic carcinogenic effects.

176.    The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

177.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the

presence of harmful chemicals including: TDA, TDI, and DEG.[21] TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[22] and has been reported to cause Occupational Asthma.[23] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[24] TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[25] TDA and TDI are potential carcinogens.[26] Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[27]

---

[21] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed December 8, 2021).

[22] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[23] Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, UpToDate.com (accessed December 8, 2021).

[24] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[25] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*

[26] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[27] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

178.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

179.    As a direct and proximate result of Defendants' conduct, Plaintiffs have a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

180.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

181.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiffs, but the full extent of the injuries will not manifest until later in the Plaintiffs' life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiffs be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

182.    Plaintiffs demand judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely

treatment and prevention of exacerbation of injuries, together with interest, costs of suit,

attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CLAIM FOR RELIEF

**ALABAMA DECEPTIVE TRADE PRACTICES ACT—DECEPTION**
**Ala. Code §§ 8-19-1 *et seq*.**
**(on behalf of Plaintiff Foster and the Alabama Subclass)**

183.    Plaintiff Foster incorporates the foregoing allegations as if fully set forth herein.

184.    At all relevant times, Plaintiff Foster and the members of the Alabama Subclass

were natural people who purchased or leased Defendants' Recalled Devices detailed above for

personal, family or household use and not for resale.

185.    At all relevant times, Defendants were either natural persons or corporations or

some other legal entity.

186.    The Recalled Devices are "goods" as defined by the Alabama Deceptive trade

Practices Act. *See* Ala. Code § 8-19-3(3).

187.    At all relevant times, Defendants were engaged in Trade or Commerce as defined

by the Alabama Deceptive Trade Practices Act. *See* Ala. Code § 8-19-3(8).

188.    The Alabama Deceptive Trade Practices Act declares that (1) passing off goods or

services as those of another; (2) causing confusion or misunderstanding as to the source,

sponsorship, approval, or certification of goods or services; (3) causing confusion or

misunderstanding as to the affiliation, connection, or association with, or certification by

another, provided that this section shall not prohibit the private labeling of goods or services; (4)

using deceptive representations or designations of geographic origin in connection with goods or

services; (5) representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship,

approval, status, affiliation, or connection that he or she does not have; (6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, secondhand, or altered to the point of decreasing their value or rendering the goods unfit for the ordinary purpose for which they were purchased; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (8) disparaging the goods, services, or business of another by false or misleading representation of fact; (9) advertising goods or services with intent not to sell them as advertised; (10) advertising goods or services with intent not to supply reasonably expectable public demand unless the advertisement discloses a limitation of quantity; (11) making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions; and (12) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce; is unlawful. *See* Ala. Code § 8-19-5.

189.    The Alabama Deceptive Trade Practices Act further states that any person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer, shall be liable to each consumer for (1) any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) up to three times any actual damages. *See* Ala. Code § 8-19-10.

190.    Defendants, by and through their employees, agents, and/or servants, and in connection with its advertising and sale of the Recalled Devices detailed above, knowingly engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

191.    Defendants knew that their statements were false or that their conduct was deceptive because they know about the degradation and off-gassing of the PE-PUR Foam used in the Recalled Devices.

192.    The facts Defendants misrepresented, concealed, suppressed or omitted as alleged above were material, are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase or lease Defendants' Recalled Devices.

193.    Defendants' misrepresentations, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and has the capacity to deceive a reasonable consumer.

194.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiff and Class members would rely on those deceptive and unfair acts and practices and induce Plaintiff and Class members to purchase or lease Defendants' Recalled Devices.

195.    Because the characteristics of the Recalled Devices were not as represented, and those characteristics are material to a reasonable consumer of the Recalled Devices, the value of the Recalled Devices was less than the value the Recalled Devices would have had the Recalled Devices actually possessed the characteristics that were represented.

196.    Plaintiff and Class members were deceived by Defendants' deceptive and unfair acts and practices in that had they known the truth they would not have purchased or leased Defendants' Recalled Devices.

197.    Instead, as a result of Defendants' misrepresentation, Plaintiff and Class members suffered monetary losses in that (1) the actual value of the Recalled Devices they received was

less than the value of the Recalled Devices as represented which denied them of the benefit of

their bargain; and (2) Plaintiff and Class members paid more than the fair market value of the

Recalled Devices they received causing them out-of-pocket damages.

198.    Plaintiff and Class members could not have avoided these injuries. Because

Defendants were the sole source of material information that Defendants failed to disclose,

Plaintiff and Class members could not have had reason to anticipate the impending harm and

thus avoided their injuries.

**TENTH CLAIM FOR RELIEF**

**ALABAMA DECEPTIVE TRADE PRACTICES ACT—UNCONSCIONABILITY**
**Ala. Code §§ 8-19-1 *et seq.***
**(on behalf of Plaintiff Foster and the Alabama Subclass)**

199.    Plaintiff Foster incorporates the foregoing allegations as if fully set forth herein.

200.    Plaintiff Foster brings this claim individually and on behalf of the members of the

Alabama Subclass.

201.    This claim is brought in the alternative to any common law claim for fraud,

misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of

any act, occurrence or transaction actionable under the Alabama Deceptive Trade Practices Act.

202.    At all relevant times, Foster and the members of the Alabama Subclass were

natural people who purchased or leased Defendants' Recalled Devices detailed above for

personal, family or household use and not for resale.

203.    At all relevant times, Defendants were corporations or some other legal entity.

204.    The Recalled Devices are "goods" as defined by the Alabama Deceptive Trade

Practices Act. *See* Ala. Code § 8-19-3(3).

205.    At all relevant times, Defendants were engaged in Trade or Commerce as defined by the Alabama Deceptive Trade Practices Act. *See* Ala. Code § 8-19-3(8).

206.    The Alabama Deceptive Trade Practices Act declares that engaging in unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce is unlawful. *See* Ala. Code § 8-19-5.

207.    The Alabama Deceptive Trade Practices Act further that any person who commits an unlawful practice under this chapter and thereby causes monetary damage to a consumer, shall be liable to each consumer for (1) Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) Up to three times any actual damages. *See* Ala. Code § 8-19-10.

208.    Defendants, by and through their employees, agents, and/or servants, and in connection with its advertising and sale of the Recalled Devices detailed above, knowingly engaged in deceptive and unconscionable acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

209.    Defendants knew that their statements were false or that their conduct was unconscionable because there was an absence of meaningful choice on Plaintiff's part.

210.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiff and Alabama Subclass members would rely on those deceptive and unfair acts and practices and induce Plaintiff and Alabama Subclass members to purchase or lease Defendants' Recalled Devices.

211.    Because the characteristics of Defendants' Recalled Devices were not as represented, and those characteristics are material to a reasonable consumer of the Recalled

45

Devices, the value of the Recalled Devices was less than the value the Recalled Devices would have had if the Recalled Devices had actually possessed the characteristics that were represented.

212.    Plaintiff and Alabama Subclass members were deceived by Defendants' deceptive and unfair acts and practices in that had they known the truth they would not have purchased or leased Defendants' Recalled Devices.

213.    Instead, as a result of Defendants' misrepresentations and/or omissions, Plaintiff and Alabama Subclass members suffered monetary losses in that (1) the actual value of the Recalled Devices they received was less than the value of the Recalled Devices as represented, denying them of the benefit of their bargain; and (2) Plaintiff and Alabama Subclass members paid more than the fair market value of the Recalled Devices they received, causing them out-of-pocket damages.

214.    Plaintiff and Alabama Subclass members could not have avoided these injuries. Because Defendants were the sole source of material information that Defendants failed to disclose, Plaintiff and Alabama Subclass members could not have had reason to anticipate the impending harm and thus avoided their injuries.

215.    Plaintiff provided Defendants with pre-suit notice pursuant to Ala. Code § 8-19-10(e) by sending a certified letter, return receipt requested, containing the basis of Plaintiffs' claims on December 10, 2021.

<u>**ELEVENTH CLAIM FOR RELIEF**</u>

**CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Civil Code §§ 17200, *et seq*.**
**(on Behalf of Plaintiff Scheiner and the California Subclass)**

216.    Plaintiff Scheiner incorporates by reference all preceding paragraphs.

217.    Plaintiff Scheiner brings this cause of action individually and on behalf of the members of the California Subclass.

218.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

219.    The acts and practices of Defendants as alleged herein  constitute "unfair" business acts and practices under the California Unfair Competition Law ("UCL") in that Defendants' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct.

220.    Defendants have, in the course of their business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by concealing the true risks of the Recalled Devices.

221.    These acts also constitute "fraudulent" business acts and practices under the UCL in that Defendants' conduct is false, misleading, and has a tendency to deceive the Class and the general public.

222.    Plaintiff Scheiner and California Subclass members have suffered injury in fact and have lost money as a result of Defendants' fraudulent business acts or practices.

223.    The unlawful, fraudulent, and unfair business acts or practices described herein present a threat and likelihood of harm and deception to Plaintiff Scheiner and California Subclass members in that Defendants have systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

224.    Pursuant to Business and Professions Code §§ 17200 and 17203, Plaintiff Scheiner and California Subclass members seek an order providing restitution and disgorgement

of all profits relating to the above-described unfair business acts or practices, and injunctive and declaratory relief as may be appropriate.

225.    Because of their reliance on Defendants' omissions concerning the Recalled Devices, Plaintiff Scheiner and California Subclass members suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

226.    Plaintiff Scheiner and California Subclass members are reasonable consumers who did not expect the risks inherent with the Recalled Devices.

227.    Defendants' conduct in concealing and failing to disclose the true risks of the Recalled Devices is unfair in violation of the UCL, because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.

228.    Defendants acted in an immoral, unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner.

229.    The gravity of harm resulting from Defendants' unlawful, fraudulent, and unfair conduct outweighs any potential utility. The Recalled Devices present a substantial health risk to consumers and harmed the public at large and is part of a common and uniform course of wrongful conduct.

230.    The harm from Defendants' conduct was not reasonably avoidable by consumers because only Defendants were aware of the true facts concerning the risks of its Recalled Devices, and Defendants did not disclose them, despite knowing of such defects. Plaintiff Scheiner and California Subclass members did not know of and had no reasonable means of discovering the true risk of using the Recalled Devices.

231.    Plaintiff Scheiner suffered injury in fact, including lost money or property, as a result of Defendants' unlawful, fraudulent, and unfair acts. Absent Defendants' conduct, Plaintiff would not have bought the Recalled Devices.

232.    Through its unlawful, fraudulent, and unfair conduct, Defendants acquired money that Plaintiff once owned.

233.    Plaintiff Scheiner and California Subclass members accordingly seek appropriate relief under the UCL, including (a) restitution in full and (b) such orders or judgments as may be necessary to enjoin Defendants from continuing their unlawful, fraudulent, and unfair practices. Plaintiff also seeks reasonable attorneys' fees and costs under applicable law, including California Code of Civil Procedure section 1021.5.

## TWELFTH CLAIM FOR RELIEF

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. §§ 501.201 *et seq.*
### (on behalf of Plaintiff Giordano and the Florida Subclass)

234.    Plaintiff Giordano incorporates the foregoing allegations as if fully set forth herein.

235.    Plaintiff Giordano and the Florida Subclass members are "consumers," as defined by Fla. Stat. § 501.203(7), the products sold by Philips are "goods" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and the transactions at issue constitute "trade or commerce" as defined by FDUTPA.

236.    The FDUTPA, Fla. Stat. § 501.204 provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

237.    For the reasons discussed herein, Philips violated and continues to violate FDUTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by Fla. Stat. § 501.201, *et seq*. Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

238.    At all times mentioned herein, Philips engaged in trade or commerce in Florida, as defined by Fla. Stat. § 501.203(8), in that they advertised, offered for sale, sold or distributed goods or services in Florida and/or engaged in trade or commerce directly or indirectly affecting the people of Florida.

239.    Philips repeatedly advertised, both on the labels for the Recalled Devices, on its websites, and through national advertising campaigns, among other items, that the Recalled Devices were and are safe for use by individuals when in fact they contain an unsafe material, PE-PUR Foam, which could cause a Recalled Device user to suffer adverse health effects from use of the Recalled Devices.

240.    Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to the Recalled Devices without being aware that the Recalled Devices contained an unsafe material that could cause adverse health effects. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiff Giordano and the Florida Subclass suffered damages by purchasing the Recalled Devices because they would not have purchased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains unsafe PE-PUR Foam.

241.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiff Giordano and the Florida Subclass in the form of the loss or diminishment of value of

the Recalled Devices, which allowed Defendants to profit at the expense of Plaintiff Giordano and the Florida Subclass. The injuries to Plaintiff Giordano and the Florida Subclass were to legally protected interests. The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

242.    Plaintiff Giordano and the Florida Subclass seek relief for the injuries they have suffered as a result of Philips' unfair and deceptive acts and practices, as provided by Fla. Stat. § 501.211 and applicable law.

## THIRTEENTH CLAIM FOR RELIEF

### ILLINOIS CONSUMER FRAUD ACT
### 815 ILCS § 505/1, *et seq.*
### (on Behalf of Plaintiff Brooks and the Illinois Subclass)

243.    Plaintiff Brooks incorporates by reference all preceding paragraphs.

244.    Plaintiff Brooks brings this cause of action on their behalf and on behalf of the members of the Illinois Subclass.

245.    Defendants engaged in unlawful, unfair, and deceptive acts and practices, with respect to the sale and advertisement of the products purchased by Plaintiff Brooks and the Illinois Subclass members, in violation of 815 ILCS § 505/2, including by concealing the true risks of the Recalled Devices. These injuries outweigh any benefits to consumers or to competition.

246.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

247.    Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Brooks and the Illinois Subclass members.

248.     Plaintiff Brooks and Illinois Subclass members would not have purchased, chosen, and/or paid for all or part of the Recalled Devices had they known that the Recalled Devices were defective.

249.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Brooks and the Illinois Subclass members suffered an ascertainable loss of money or property, real or personal, as described above.

250.     Plaintiff Brooks and the Illinois Subclass members seek relief under 815 ILCS § 505/10a, including, but not limited to injunctive relief, damages, restitution, punitive damages and attorneys' fees and costs.

251.     A copy of this complaint is being sent to the Illinois Attorney General.  815 ILCS § 505/10a.

## FOURTEENTH CLAIM FOR RELIEF

### VIOLATION OF IOWA PRIVATE RIGHT OF ACTION
### FOR CONSUMER FRAUDS ACT
### (Iowa Code § 714H.1, *et seq.*
### (on Behalf of Plaintiff Eldridge and the Iowa Subclass)

252.     Plaintiff Eldridge hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

253.     Plaintiff Eldridge brings this claim on behalf of herself and members of the Iowa Subclass.

254.     The Iowa Private Right of Action for Consumer Frauds, Act, Iowa § 714H.3, provides in pertinent part:

> A person shall not engage in a practice or act the person knows or reasonably should know is [a] deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely  upon the unfair practice, deception, fraud, false

pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise…

255.     Under the Iowa Private Right of Action for Consumer Frauds Act, actual damages "means all compensatory damages proximately caused by the prohibited practice or act that are reasonably ascertainable in amount" and [a] consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages," equitable relief, including a temporary or permanent injunctive relief, and reasonable attorney's fees.

256.     Philips violated and continues to violate the Iowa Private Right of Action for Consumer Frauds Act, Iowa § 714H.3, by engaging in the herein described unconscionable, deceptive, and unfair acts or practices.  Philips acts and practices, including its material omissions, as described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

257.     At all times mentioned, Philips engaged in trade or commerce in Iowa in that they advertised, offered for sale, sold or distributed goods or services in Iowa and/or engaged in trade or commerce directly or indirectly affecting the people of Iowa.

258.     Philips repeatedly advertised, both on the labels for the Recalled Devices, on its websites, and through national advertising campaigns, among other items, that the Recalled Devices, were and are safe for use by individuals when in fact they contain an unsafe material, PE-PUR Foam, which would cause a Recalled Device user to suffer adverse health effects from use of the Recalled Devices.

259.     Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase or otherwise use the Recalled Devices without being aware that the Recalled Devices contained an unsafe material that could cause

adverse health effects.  As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiff Eldridge and the Iowa Subclass suffered damages by purchasing or leasing the Recalled Devices because they would not have purchased or leased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains such unsafe elements or materials.

260.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiff Eldridge and the Iowa Subclass in the form of the loss or diminishment of the value of the Recalled Devices, which allowed Defendants to profit at the expense of Plaintiff Eldridge and the Iowa Subclass.  The injuries to Plaintiff Eldridge and the Iowa Subclass are legally protected interests.  The gravity of harm of Philips actions is significant and there is no corresponding benefit to consumers of such conduct.

261.    Plaintiff Eldridge and the Iowa Subclass have sustained ascertainable losses of money, and are entitled to actual damages and appropriate injunctive relief, as the result of a prohibited practice or actions.  In addition, Plaintiff Eldridge and the Iowa Subclass shall show by a preponderance of clear, convincing, and satisfactory evidence that the prohibited practice or act in violation in willful and wanton disregard for the rights or safety of another, entitling them to statutory damages up to three times the amount of actual damages may be awarded to a prevailing consumer.

## FIFTEENTH CLAIM FOR RELIEF

**LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**La. Rev. Stat. Ann. §§ 51:1401, *et seq.***
**(on behalf Plaintiff Reed and the Louisiana Subclass)**

262.    Plaintiff Reed incorporates the foregoing allegations as if fully set forth herein.

263.     Plaintiff Reed brings this Claim individually and on behalf of the Louisiana Subclass.

264.     At all relevant times, members of the Louisiana Subclass and Defendants were corporations or another legal entity.

265.     At all relevant times, Defendants were engaged in "trade" or "commerce" as defined by La. Rev. Stat. Ann. §§ 51:1402(10).

266.     Louisiana's Unfair Trade Practices and Consumer Protection Law prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. §§ 51:1405(A).

267.     Louisiana's Unfair Trade Practices and Consumer Protection Law further provides that any person who suffers any ascertainable loss of money as a result of the use or employment by another person of an unfair or deceptive method, act, or practice may bring an action to recover actual damages.

268.     Defendants negligently, willfully, purposefully and/or wantonly and recklessly engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection its advertising, offering for sale, sale, or distribution of property, in violation of La. Rev. Stat. Ann. § 51:1405(A) as described in the allegations above.

269.     Defendants' misrepresentations and omissions in the sale of the Recalled Devices detailed above is an act or practice in the conduct of trade or commerce.

270.     Defendants' misrepresentations and omissions in the sale of its Recalled Devices detailed above impacts the public interest.

271.    Plaintiff Reed and the Louisiana Subclass were deceived by Defendants' deceptive and unfair acts and practices in that had they known the truth they would not have purchased or leased the Recalled Devices or would have paid less for those products.

272.    Instead, as a result of Defendants' misrepresentations, Plaintiff Reed and the Louisiana Subclass suffered monetary losses in that (1) the actual value of the Recalled Devices received was less than the value of the Recalled Devices as represented denying them of the benefit of their bargain; and (2) Plaintiff Reed and the Louisiana Subclass paid more than the fair market value of the Recalled Devices they received causing them out-of-pocket damages.

273.    Defendants' misrepresentations and omissions in the sale or lease of the Recalled Devices detailed above were unfair because they inequitably enriched Defendants at the expense of Plaintiff Reed and the Louisiana Subclass.

274.    Defendants' misrepresentations and omissions in the sale or lease of the Recalled Devices detailed above were unfair because they offend public policy, and were so oppressive that the Louisiana Subclass had little alternative but to submit and causes consumers substantial injury.

275.    Defendants' misrepresentations and omissions in the sale of the Recalled Devices were unfair in that they violated the well-established public policies of protecting consumers from avoidable dangers and that the manufacturer of devices is responsible for ensuring that they are fit for human use.

276.    Plaintiff Reed and the Louisiana Subclass have suffered economic injury as a direct and proximate result of the Defendants' conduct.

277.     As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described above.

278.     Plaintiff Reed and the Louisiana Subclass seek relief pursuant to La. Rev. Stat. Ann. § 51:1409, including, *inter alia*, treble damages, attorney's fees, and costs.

## SIXTEENTH CLAIM FOR RELIEF

### NEW YORK GENERAL BUSINESS LAW
### Gen. Bus. Law §349, et seq.
### (on behalf of Plaintiff Miller and the New York Subclass)

279.     Plaintiff Miller incorporates the foregoing allegations as if fully set forth herein.

280.     New York General Business Law ("GBL") §349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ."  GBL §349(a).

281.     The practices alleged herein - namely, Defendants' use of deception, fraud, false pretenses, and omissions of material fact in connection with its failure to disclose to Plaintiff Miller and the New York Subclass that the Recalled Devices contained the dangerous material PE-PUR Foam which does not conform to the products' labels, packaging, advertising, and statements - are unfair, deceptive, and misleading in violation of GBL §349.

282.     Because the dangers presented by the presence of PE-PUR Foam pertain to the Recalled Devices' central functionality, *i.e.*, the safety of the devices for human use, these failures reflect material facts, and Philips was obligated to disclose these material facts to Plaintiff Miller and the New York Subclass.  A reasonable consumer attaches importance to such material facts and are induced to act thereon in making purchasing decisions.

283.     Because Philips failed to disclose these material facts, consumers were misled.

284.    At all relevant times, Philips had exclusive knowledge that the PE-PUR Foam present in the Recalled Devices could cause users of the Recalled Devices to suffer adverse health effects which do not conform to the products' labels, packaging, advertising, and statements.

285.    Philips further knew or reasonably should have known that there was no disclosure on the Recalled Devices' packaging, or at the point of sale, that the products contained dangerous materials that were at risk of causing users of the Recalled Devices to suffer from adverse health effects.

286.    At all relevant times, Philips knew or reasonably should have known that Plaintiff Miller and the New York Subclass relied on the foregoing omissions and will continue to be deceived and harmed by Philips' foregoing unfair practices.

287.    The foregoing deceptive acts and practices were directed at Plaintiff Miller and the New York Subclass.

288.    Plaintiff Miller and the New York Subclass have been injured as a direct and proximate result of Philips' violations described above as they would not have purchased the Recalled Devices at all had they known of the aforementioned risk of suffering adverse health effects as a result of the presence of the dangerous PE-PUR Foam.

289.    As a result of Philips' unlawful action, Plaintiff Miller and the New York Subclass seek to enjoin Defendants' deceptive and unlawful acts and practices described herein to recover actual damages, fifty dollars or both, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.      An order certifying this action and the Nationwide Class and State Subclasses requested herein as a class action, designating Plaintiffs as representatives of the Nationwide Class and their respective State Subclass, and appointing Plaintiffs' counsel as counsel to the Nationwide Class and State Subclasses;

B.      An order declaring that Philips' actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; and (vi) unfair and deceptive business practices in violation of aforesaid state laws and statutes, and that Philips is liable to Plaintiffs and the Nationwide Class and State Subclasses, as described herein, for damages arising therefrom;

C.      A judgment awarding Plaintiffs and members of the Nationwide Class and State Subclasses all appropriate damages in an amount to be determined at trial;

D.      A judgment awarding Plaintiffs and the Nationwide Class and State Subclasses medical monitoring damages;

E.      A judgment awarding Plaintiffs and the Nationwide Class and State Subclasses prejudgment and post-judgment interest, as permitted by law;

F.      A judgment awarding Plaintiffs and the Nationwide Class and State Subclasses costs and fees, including attorneys' fees, as permitted by law; and

G.      Grant such other legal, equitable or further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED:  December 14, 2021          Respectfully submitted,

**LEVIN SEDRAN BERMAN LLP**

   */s/ Sandra L. Duggan*
Sandra L. Duggan (PA Bar #56420)
Arnold Levin (PA Bar #02280)
Laurence S. Berman (PA Bar #26965)
Frederick S. Longer (PA Bar #46653)
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
sduggan@lfsblaw.com
lberman@lfsblaw.com
flonger@lfsblaw.com

**BARRACK, RODOS & BACINE**
Jeffrey A. Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Fax: (215) 963-0838
jbarrack@barrack.com

**BARRACK, RODOS & BACINE**
Stephen R. Basser
One America Plaza
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Fax:  (619) 230-1874
sbasser@barrack.com

**EMERSON FIRM, PLLC**
John G. Emerson
2500 Wilcrest, Suite 300
Houston, TX 77042
Telephone: (800) 551-8649
Fax: (501) 286-4659
jemerson@emersonfirm.com

*Attorneys for Plaintiffs*